**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | **No. 1:22-cr-00265 RC-1** |
| | : | |
| | : | |
| | : | |
| **TIMOTHY WILLIAMS** | : | |

**DEFENDANT TIMOTHY WILLIAMS'MOTION FOR**
**TRANSFER OF THE CASE TO THE DISTRICT OF COLORADO WITH**
<u>**INCORPORATED MEMORANDUM OF POINTS AND AUTHORITIES**</u>

COMES NOW Defendant, Timothy Williams, by and through undersigned counsel, pursuant to Federal Rule of Criminal Procedure 21(a), hereby respectfully moves this Honorable Court for the entry of an Order to transfer the proceedings to the District of Colorado. *See* Exhibit 1, Jury Survey (comparing similar districts).[1]

As grounds, the following is stated:

<u>**Background**</u>

Mr. Williams  is charged by information with:

Count 1 – 18 U.S.C. § 1752(a)(1) (Entering or Remaining in any Restricted Building or Grounds).

---

[1]

The jury survey attached was created by an expert hired by the Office of the Federal Public Defender as an effort to assess the federal jury pool in the District of Columbia. This motion to transfer venue is largely based on a similar motion filed in *U.S. v. Joshua C. Doolin*, 21-cr-447-CJN*, U.S. v. Gieswein*, 21-cr-24 (EGS), and in *U.S. v. Sean McHugh*, 21-453 (JDB).

Count 2 – 18 U.S.C. §1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building Parading, Demonstrating, or Picketing in a Capitol Building).

Count 3 - 40 U.S.C. §5104(e)(2)(D) (Disorderly Conduct in a Capitol Building or Grounds).

Count 4 - 40 U.S.C. §5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).

A jury trial is scheduled for February 21, 2023.

## ARGUMENT

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; see also *Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is fundamental to Due Process and, notwithstanding constitutional venue prescriptions, when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court must transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed venire bias and actual juror bias). As recently as 2010, the Supreme Court reaffirmed the presumption approach articulated in *Patton* and identified three factors to guide the lower courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3)

the time period between the arrest and trial, as it relates to the attenuation of the media coverage. *Skilling,* 561 U.S. at 378.

Where it attaches, the Court has further recognized that the presumption of prejudice overrides juror declarations of impartiality during voir dire because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and  impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the voir dire record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, under this precedent, voir dire is simply not a cure for significant and substantiated Due Process concerns about the jury pool.

Each of those concerns is pressing in this case.

### A.    The Size and Characteristics of the District of Columbia Jury Pool Weigh in Favor of Finding a Presumption of Prejudice.

The foundation for the presumption of prejudice is found in *Rideau.* 373 U.S.

at 727. In *Rideau,* the first factor that the Court weighed in favor of a finding of prejudice was that about half of the small jury pool had been exposed to prejudicial media reporting about the case. *See Id.* Despite the fact that voir dire revealed that only three jurors had actually seen the broadcasts at issue, the Court found that the share of the pool that was tainted was significant enough as to render the defendant presumptively prejudiced. *See Id.*

Because measuring the reach and impact of negative media reporting is difficult, in applying *Rideau,* many courts have focused on population size and diversity as a proxy for the share of the population that was likely impacted. For example, in *Skilling,* the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal, and because Houston is the fourth-largest city in the United States, and is highly diverse, a significant number of prospective jurors would have had no connection to Enron whatsoever. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] voir dire yielded jurors whose links to Enron were either nonexistent or attenuated.").

In contrast to Houston, the District of Columbia is one of the smaller major US cities, with a population under 700,000.  And the impact of the events of January 6 on the residents of the District of Columbia were far more widespread than that of Enron in Houston, affecting a far greater share of residents than the conduct at issue in *Skilling*.

First, as the Court is no doubt aware, a huge proportion of District of Columbia residents either work for the federal government themselves or have friends or family who do. Specifically, as of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater DC area (excluding postal workers, Federal Bureau of Investigation workers, and staff on several federal commissions).  Nearly 200,000 of those workers and annuitants are within the District itself. With a total population of around 690,000, it seems clear that any given member of the District

jury pool has a greater likelihood of being closely connected to the federal government than those in comparable metro areas. In fact, as of 2019, according to the  DC  Policy  Center,  active  federal  employment  (including  postal  workers) accounts for nearly a third of all jobs in the District itself.

And of course, for each federal worker, there are many friends and family members who are closely connected to the federal government by proxy.

In particular, nearly 15,000 individuals work for Congress directly, and many more residents have friends and family who do.   Another large share are in, or have friends and family in, the many law enforcement groups who took part in responding to January 6.  This means that an enormous share of District of Columbia residents have significant and unique connections with individuals or institutions that were affected by January 6. Such connections are not likely to be present in any other comparable district. The government has characterized the events of January 6 – including the allegations against  Mr.Williams (18 U.S.C. §

1752(a)(1) & (a)(2) – as an attack on our elections, government institutions generally, and democracy as a whole, suggest that those District residents closely connected to the government are more likely to view themselves as the direct victims of the events.

Second, even District residents that have no direct connection to the government reported feeling deeply traumatized by the events that took place so close to where they live and work. For example, one DC resident shared in an interview that:

> I have not been able to digest any of the atrocities that took place last night here in Washington, D.C., you know, literally eight blocks away from my front door[.] I've been having a lot of conversations with people this morning, loved ones. We're all hurting. We're terrified. We're in shock. And I think it's going to take a while. This is by far the darkest moment of my 45-year existence. [2]

Such accounts are typical of those gathered in interviews in the days following January 6th, during which the Mayor declared a state of emergency, implemented a city-wide curfew, restricted access to particular roads and bridges, and requested that residents not attend inauguration. District neighborhoods became occupied by the Metropolitan Police and over 25,000 military personnel in

---

[2] D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol, CBC (Jan. 7, 2021), https://www.cbc.ca/radio/asithappens/as-it-happens thursday-edition-1.5864816/d-c-resident-who-gave-blm-protesters-refuge-condemns atrocities-at-u-s-capitol-1.5864894.

the weeks that followed. Indeed, a local subsidiary of the national public broadcasting network, *DCist,* reported that:

> Residents have rescheduled medical appointments or switched up their bike and run routes to steer clear of downtown D.C. or the Capitol complex. Others say they are avoiding speaking Spanish in public or buying items like baseball bats for personal protection. Some are making plans to leave the city for inauguration. And many have feelings of anger, sadness, and heightened anticipation for the near future. […] Some residents are also worried that a stepped up military and police presence in the city may only add to their unease. [3]

Moreover, as the Court is no doubt aware, the effects of these events continue to be felt in the District. Indeed, District residents reacted with fear in anticipation of protests planned for September of 2020 that were intended to show support for individuals detained in connection with prosecutions arising from the events of January 6. For example, the New York Times ran a piece titled "Washington, D.C. On Edge Over January 6 Protests,"[4]  and the Associated Press similarly reported "In Edgy Washington, Police Outnumber Jan 6 Protestors," capturing the District's overall tenor and response to these ongoing demonstrations.[5]

---

[3]  Jenny Gathright and Rachel Kurzius, What It Feels Like to Live Under D.C.'s State  of Emergency, DCist (Jan. 13, 2021), https://dcist.com/story/21/01/13/dc-state-of   emergency-residents/

[4]  Jonathan Weisman and Matthew Rosenberg, Washington, D.C., on Edge Over  Protest of Jan. 6 Arrests, N.Y. Times (Sept. 18, 2021), https://www.nytimes.com/2021/09/18/us/politics/capitol-sept-18-rally.html

[5]  Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021), https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-

(continued...)

Third, an overwhelming number of District of Columbia residents — over 92 percent — voted for President Biden. According to the government's theory of the case, Mr. Williams and the others charged in connection with January 6 did what they did in order to prevent Joseph Biden from becoming President notwithstanding his share of the electoral and popular vote. That is, the government's theory is that Mr. Williams and others were seeking to nullify the votes of an overwhelming majority of District residents  – in the only national election in which District residents have any say, given their lack of representation in Congress. *See, e.g., Castanon v. United States*, 444 F. Supp. 3d 118, 139 (D.D.C. 2020) ("Article I contemplates that only 'residents of actual states' have and may exercise the House franchise") *(citing Adams v. Clinton*, 90 F. Supp. 2d 35, 47 (D.D.C.), *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940 (2000)), reconsideration denied, No. CV 18-2545, 2020 WL 5569943 (D.D.C. Sept. 16, 2020), aff'd, No. 20-1279, 2021 WL 4507556 (U.S. Oct. 4, 2021). Finally, the government, the media, and even judges in this division speak of these prosecutions as designed to prevent "another January 6," and District of Columbia residents know that a repeat of January 6 can only take place in their home. As such, the residents of the District sitting as jurors are highly likely to view Mr. WilliamsA not only as someone who victimized them, but also as someone who might victimize them again in the future, raising a concern about punishing for propensity.

---

[5](...continued)
ready-for-rally-supporting-jan-6-rioters.

Given the electoral makeup of the District, it would be impossible to empanel a jury that was not full of people that the government charges were the targets of Mr. Williams's alleged offenses. *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (the

population of the greater metro area, including Virginia and Maryland, was large enough to not support an inference of prejudice by media reporting). Thus, though significantly more populous than the pool in *Rideau*, for example, Mr. Williams submits that the impact of the events of January 6 was felt by a far greater proportion of the residents and felt much more personally and viscerally. The events of January left those residents—and therefore the jury pool—neither impartial nor indifferent.

**B.    The Nature and Volume of National and Local Media Coverage Weigh in Favor of Finding That There is a Presumption of Prejudice Because of Greater Saturation and Impact at the Local Level.**

Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences."). This is especially true where publicity is both extensive and sensational in nature. *Quiles-Olivo*, 684 F.3d at 182. That said, observing that

"prominence does not necessarily produce prejudice, and juror impartiality does not require ignorance," the Supreme Court has repeatedly rejected claims of prejudice that rely exclusively on negative but dispassionate media reporting. *Skilling,* 561 U.S. at 358 (*citing Irvin, 366 U.S. at 722*). Something more, such as charged rhetoric or the reporting of gruesome details, is needed to establish prejudice. See id. (rejecting the argument that media coverage was prejudicial where "media coverage, on the whole, had been objective and unemotional, and the facts of the case were neither heinous nor sensational."). The Court has repeatedly recognized that "something more" exists when the media coverage is particularly inflammatory, and where it pervades the court proceedings. See *Murphy*, 421 U.S. at 799 (1975) ("In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings"); see also id. ("[P]roceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled"). Finally, the problematic media must either be local in distribution, or must have greater local saturation or impact than in other districts; otherwise, there is no disparate prejudicial effect between different (comparable) venues.

For example, in *Skilling,* the defendant cited to hundreds of media reports about the Enron scandal in his motion for a transfer of venue. 561 U.S. at 358. He argued that as the former Chief Executive Officer, such articles necessarily implicated him by proxy, if not directly. See id. The Court disagreed, referencing its earlier opinions concerning the modern ubiquity of news media, and reiterating its

former conclusion that volume does not, on its own, create prejudice. See id. at 382. Rather, it is sensationalism of the type that would be easily remembered—not an objective reporting of the facts—that was found to be prejudicial in prior cases before the Court. Id. at 381. The Court observed that the stories that *Skilling* cited about Enron contained "no confessions, no blatantly prejudicial information," and were "largely objective and unemotional." Id. at 370-71, 382 (observing that none of the reports "invited prejudgment of his culpability"). As such, the Court held that it was inappropriate to apply a broad presumption of prejudice.

Here, in a city still feeling the impacts described supra, the pre-trial publicity—both national and local–has only served to enhance and sustain the effects and by extension, sentiments about the participants. The volume, depth of coverage, and duration of the reporting about January 6 has been almost entirely unprecedented, perhaps only comparable to the reporting following September 11. And viewers who identified as Democrats—like most of the District population — were 20% more likely to have reported hearing "a lot" about the events than those who identify as Republicans. It has also been sensational, including the repeated showing of select snippets of photographic and video footage appearing to show the destruction of the Capitol property and officers in distress. Indeed, some of these officers have testified before Congress about their experiences that may or may not have been representative of the whole—testimony that was also widely circulated in print and through video.

The language used in media coverage of the events of January 6 and of the

defendants involved in those events has been especially charged and inflammatory. Reporters and their interviewees, including members of Congress, consistently refer to the defendants as "insurrectionists," "rioters," "seditionists," "domestic terrorists" "white supremacists" and "criminals" in the media. For example, in late January, President Biden referred to those involved in the January 6 events as "a group of thugs, insurrectionists, political extremists, and white supremacists." Similarly, representative Cori Bush called the January 6 incident "a white supremacist insurrection" and a "domestic terror attack." [6] The coverage of the scene itself has also been sensationalist, relying on gruesome details in click-bait headlines to galvanize the public.

This is hardly comparable to the "unemotional" reporting on Enron's collapse and the white collar crime allegations against its management as described by the Court in *Skilling*. 561 U.S. at 371-72, 382.

Additionally, much of the early reporting has since been shown to be factually inaccurate. For example, immediately following the events of January 6, President Biden, among other high-profile individuals, claimed that January 6 protestors killed Officer Brian Sicknick, and he repeated the claim months after it became clear that there was no basis for it. Even the official press release stated that:

---

[6] *Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief'*, NBC4 Washington (Jan. 13, 2021), https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-in-chief/2540892/.

> Officer Brian D. Sicknick passed away due to injuries sustained while on-duty. Officer Sicknick was responding to the riots on Wednesday, January 6, 2021, at the U.S. Capitol and was injured while physically engaging with protesters. [7]

These claims were widely circulated and did reputational damage to defendants before the medical examiner quietly reported—more than four months later—that Officer Sicknick died of two strokes, and that he sustained no internal or external injuries from his exposure to chemical spray on January 6. The often repeated but wrong claim that protesters killed this officer could be especially prejudicial to Mr. Williams, who also stands accused of assaulting police officers.

The saturation of this charged and inflammatory reporting in the District is so substantial that it would be surprising to identify any potential jurors who have not been exposed to the coverage. And although some in the jury pool may not have heard of Mr. Williams specifically, his presence at the Capitol that day will necessarily cause prospective jurors to link his conduct to the January 6 reporting generally. And as the Court found in *Rideau*, "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." 373 U.S. at 726.

Finally, the media has widely reported comments of U.S. District Court Judges in this District regarding the events of January 6. For example, in comments that were widely reported, a judge stated that "everyone participating in

---

[7] *Press Release: Loss of USCP Officer Brian Sicknick*, United States Capitol Police (Jan. 7, 2021) (emphasis added), https://www.uscp.gov/media-center/press-releases/loss-uscp-colleague-brian-d-sicknick.

the mob contributed to [the January 6] violence," and went on to conclude that "[m]embers of a mob who breach barriers and push back officers to disrupt the joint session of Congress are not trespassers, they are criminals." [8] There is no doubt that more than only District residents were exposed to these comments, which were in effect legal conclusions about every January 6 defendant who will go before a jury in this District. However, while the media coverage of these comments, among others, may not create disparate prejudice between the District jury pool and other jury pools by nature of its national broadcast, it does create disparate prejudice at the venue itself: because the comments were made by a member of the same court that is expected to provide instructions on burdens of proof and the presumption of innocence—instructions that are in direct conflict with the declarations that those involved are "criminals"—there is a serious question as to whether the earlier comments will be disregarded in favor of the instructions that carry precisely the same institutional authority. Thus, by members of this Court commenting on guilt prior to trial, this venue is necessarily tainted.

## C. The Timing of the Proceedings Weighs in Favor of Finding a Presumption of Prejudice.

Finally, in determining whether any prior prejudice has been mitigated by the passage of time, the Supreme Court has considered the years between the exposure of the offense conduct and the trial. For example, in *Skilling*, the Court

---

[8] *'Almost Schizophrenic': Judge Rips DOJ Approach to Jan. 6 Prosecutions*, Politico (Oct. 28, 2021) (emphasis added), https://www.politico.com/news/2021/10/28/almost-schizophrenic-judge-rips-doj-approach-to-jan-6-prosecutions-517442; *see also* Fischer et al., *supra* note 16.

found that because more than four years had passed between the Enron scandal and the defendant's trial, "the decibel level of media attention diminished somewhat in the years following Enron's collapse," and any exposure to the early reporting would have become attenuated. *Skilling*, 561 U.S. at 383.

Here, in the 21 months since January 6, 2021, media reporting about the events of January 6th remains at an all-time high. This has been especially true in recent months, given the high-profile House Select Committee activities focused on investigating the events, as well as several other high-profile January 6th trials (and sentencings) occurring in this Courthouse. Additionally, many documentaries that include extensive footage of the day have been released—footage that would likely be offered into evidence by the prosecution at trial. For example, HBO released a feature-length *Four Hours at the Capitol* in late October, 2021, which includes one of the most widely-circulated videos from that day: the breaking of a Capitol window. [9] There is no reason to think that coverage will wane before Mr. Williams's January 2023 trial, especially given the recent activities of the Select Committee and the several other January 6th trials – and sentencings.

Interest in the events of January 6, 2021, has been high since that day, and it has not waned in the District in the short time since. As such, the timing of the proceedings weighs in favor of a finding of presumed prejudice.

---

[9]*Four Hours at the Capitol*, HBO (Oct. 4, 2021); *see also Day of Rage: How Trump Supporters Took the U.S. Capitol* at 18:17-21, N.Y. Times (June 30, 2021), https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons and such other reasons that may appear just and proper, Mr. Williams requests this Court to grant this motion and transfer the case to the District of Colorado.

.

Dated: October 27, 2022


                    Respectfully submitted,


                    _____
                    Joseph R. Conte, Bar #366827
                    Counsel for Timothy Williams
                    Law Office of J.R. Conte
                    8251 NW 15th Ct.
                    Coral Springs, FL 33071
                    Phone:     202.236.1147
                    Email:     dcgunlaw@gmail.com