## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-265 (RC)** |
| **v.** | : | |
| | : | |
| **TIMOTHY WAYNE WILLIAMS,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Timothy Wayne Williams to 15 months of incarceration, a sentence at the midpoint of the 12- to 18-month guideline range calculated by the United States Probation Office and the parties, 12 months of supervised release, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Timothy Williams, 40 years old, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Williams pled guilty to one count of violating 18 U.S.C. § 1752(a)(1) and one count of violating 18 U.S.C. § 641, both misdemeanors. As explained herein, a sentence of incarceration is appropriate in this case because (1) Williams joined the riot early—rallying with the front lines of the mob as it assaulted police lines on the upper West Plaza and the Northwest Scaffolding;

1

(2) entered the Capitol through the Senate Wing Door within a minute of its initial breach; (3) looted a U.S. Capitol Police Officer's riot helmet and bag, kept possession of this equipment until after the entry of his guilty plea, and lied to the FBI about stealing these items; (4) joined the mob as it pushed against police in the  Crypt, and (5) spent 35 minutes roaming through many different locations in the  Capitol, including the suite of offices used by the Speaker of the House.

The Court must also consider that Williams' conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the U.S. Capitol building, and disrupt the proceedings. Here, the facts and circumstances of Williams' crime support a sentence of 15 months of incarceration—the midpoint of the guidelines range.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 65 (Statement of Offense) ¶¶ 1–7.

### Defendant Williams' Role in the January 6, 2021 Attack on the Capitol

Williams traveled with his girlfriend from Trinidad, Colorado, to participate in the "Stop the Steal" rally against the results of the 2020 Presidential Election. Following the rally, Williams approached the U.S. Capitol building from the West Front. Williams carried an American flag on a flagpole and wore a black and white Hortilux cap, a black backpack, and a black hoodie. Williams joined a large mob gathering at the base of the Northwest Scaffolding, which had been set up for the upcoming Presidential inauguration. As more and more rioters joined the mob, the mob became more and more irate, antagonizing police officers who were attempting to keep rioters from crossing further and further into restricted U.S. Capitol grounds. As the situation escalated and

police were forced to fall back, Williams darted forward to the front of the mob, rushing the scaffolding. *See* Images 1 and 2 (screenshots from Exhibit 1).



*Image 1*                                    *Image 2*

Williams remained with the mob under the scaffolding, *see* Exhibit 2, until rioters broke through another line of police and rushed up a stairway toward the Upper West Terrace and Northwest Courtyard. As Williams moved up those stairs, he gestured for the crowd to follow him. *See* Image 3.



*Image 3*

Once Williams reached the Northwest Courtyard, he joined the first group of rioters gathering at the Senate Wing Door in an attempt to break into the building. *See* Exhibit 3. At approximately 2:13 p.m., that group of rioters successfully breached the Senate Wing Door and the windows on either side, and the mob poured inside the Capitol. One minute later, Williams unlawfully entered the Capitol through the breached Senate Wing Door. *See* Image 4.



*Image 4*

From there, Williams moved further into the building. At approximately 2:16 p.m., Williams passed the Supreme Court Chamber Stairs and made his way toward a hallway running along the east side of the building. As he passed a door leading to the building's exterior known as the Law Library Door, Williams noticed a pile of U.S. Capitol Police equipment gathered just inside the door's vestibule. Williams entered the vestibule, picked up and examined one of the equipment bags, then carried the bag off with him. *See* Exhibit 4 (screenshot below).



*Screenshot from Exhibit 4 (bag indicated by red arrow)*

Williams kept this bag—which held a riot helmet issued to a U.S. Capitol Police officer who was, at the time, guarding the exterior of the Law Library Door—on his person for the rest of his time at the Capitol.

After stealing the police bag and riot helmet, Williams made his way to the Crypt, where he joined a mass of rioters pushing against a line of police who were attempting to keep rioters from invading other areas of the Capitol. The mob eventually broke this police line, and Williams joined rioters flooding onto the Capitol's second floor. *See* Images 5 and 6.



*Image 5*



*Image 6*

At approximately 2:33 p.m., Williams—having made his way to the Capitol's second

floor—reached and walked through the Speaker of the House's suite of offices, where he casually

passed a door behind which several members of the Speaker's staff were hiding from the mob. *See* Image 7.



*Image 7*

At approximately 2:34 p.m., Williams used a door in the Speaker's Suite to gain access to the Speaker's Balcony. *See* Image 8.



*Image 8*

Between approximately 2:38 p.m. and 2:41 p.m., Williams walked through the Capitol Rotunda until reaching the Gallery Stairs, which Williams used to access the Capitol's third floor. Williams walked through various hallways on the third floor for approximately 2.5 minutes before returning to the second floor.

Between approximately 2:45 p.m. and 2:48 p.m., Williams continued to walk through areas on the Capitol's second floor, including the Rotunda, the Statuary Hall Connector, and Statuary Hall. *See* Image 9.



*Image 9*

Finally, at approximately 2:49 p.m., Williams exited the Capitol through the East Rotunda Door. Williams spent a total of approximately 35 minutes inside the U.S. Capitol Building.

*Williams' Interview with the FBI*

On March 17, 2021, Williams and his girlfriend were interviewed by the FBI at their residence. Williams admitted that he went inside the U.S. Capitol on January 6, 2021, but claimed that he "got pushed" inside by the crowd. Williams claimed to have seen someone throw a fire extinguisher while he was in the Capitol. The FBI specifically asked Williams whether he took any items from the Capitol. Williams denied taking anything from the Capitol.

*The Charges and Plea Agreement*

On May 28, 2021, the United States charged Williams by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On June 4, 2021, he was arrested. On August 4, 2022, the United States charged Williams by a four-count Information with the same four charges. On January 30, 2023, the United States filed a five-count Superseding Information, which added a fifth count charging Williams with violating 18 U.S.C. § 641.

On February 21, 2023, pursuant to a plea agreement, Williams pled guilty to Counts One and Five of the Superseding Information, charging him with violations of 18 U.S.C. 1752(a)(1) and 18 U.S.C. § 641. By plea agreement, Williams agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Williams now faces sentencing on one count of violating 18 U.S.C. 1752(a)(1) and one count of violating 18 U.S.C. § 641. For each of these counts, as noted by the plea agreement and the U.S. Probation Office, he faces up to one year of imprisonment and a fine of up to $100,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Williams' adjusted offense level under the Sentencing Guidelines as follows:

Count One: Entering and Remaining in a Restricted Building or Grounds
      Base Offense Level (U.S.S.G. § 2B2.3(a))                    +4
      Specific Offense Characteristics (U.S.S.G. § 2B2.3(b)(1)(A))    +2
      Adjusted Offense Level                               6

Count Five: Theft of Government Property
      Base Offense Level (U.S.S.G. § 2B1.1(a))                    +6
      Victim Related Adjustment (U.S.S.G. § 3A1.2(a))        +3
      Adjusted Offense Level                               9

Multiple Count Adjustment
      No grouping; each conviction its own unit (U.S.S.G. § 3D1.2(a))
      Total 2 units (U.S.S.G. § 3D1.4(a) & (b))

      Combined Adjusted Offense Level                11
      Acceptance of Responsibility (U.S.S.G. § 3E1.1(a))     -2

      Total Offense Level                             9

*See* PSR ¶¶ 43–64.

The U.S. Probation Office calculated Williams' criminal history as a category of IV. PSR ¶ 79. Accordingly, the U.S. Probation Office calculated Williams total adjusted offense level, after acceptance, at 9, and his corresponding Guidelines imprisonment range at 12 months to 18 months. PSR at ¶ 127. Williams' plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court

knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to

Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and

fairness.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies

the factors a court must consider in formulating the sentence. In this case, as described below, the

Section 3553(a) factors weigh in favor of 15 months of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy."

*United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds

of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States

v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Williams'

participation in that attack to fashion a just sentence, this Court should consider various

aggravating and mitigating factors. Notably, for a misdemeanor defendant like Williams, the

absence of violent or destructive acts is not a mitigating factor. Had Williams engaged in such

conduct, he would have faced additional criminal charges.

One of the most important factors in Williams' case is his eager participation at the front

lines of the riot. When Williams saw that rioters had broken through the police lines and begun

their drive up the Northwest Scaffolding, he bolted forward, eager to join the mob as it pressed

forward. *See* Exhibit 1. Williams encouraged the mob despite witnessing police officers being

assaulted, injured, and overwhelmed. *See* Image 3, *supra*. Williams entered the Capitol through the Senate Wing Door within a minute of its initial breach, roamed throughout the Capitol, including within feet of where staffers were hiding, and joined with other rioters in pushing against a police line in the Crypt.

Another important factor is Williams's theft of an officer's riot helmet. Because of Williams, a police officer dedicated to protecting the U.S. Capitol amidst the chaos and violence of the day lost an important piece of protection. Moreover, Williams lied to the FBI when he said that he did not steal anything from the Capitol. Rather than accept responsibility for his theft, Williams chose to avoid accountability and respond to law enforcement with dishonesty.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. The History and Characteristics of Williams

As set forth in the PSR, Williams, age 40, has an extensive criminal history.  The PSR lists 2 juvenile adjudications and 8 adult convictions, including multiple aggravated assaults and thefts. PSR ¶¶ 68–77. Williams' aggravated assault with a deadly weapon conviction from 2004 was for grabbing his ex-girlfriend—the mother of his biological son—by the neck while holding a knife. PSR ¶ 70. Williams was initially given a deferred sentence for this crime and placed on probation, but (as described below) in 2010, the court revoked probation and sentenced him to 5 years of imprisonment.. In 2010, Williams was convicted on  another aggravated assault with a deadly weapon charge in state court, for which he was sentenced to five years' imprisonment. Williams was also convicted of a firearms offense in federal court for "a confrontation at a house party during which he pointed a Hi-Point, .380 caliber, semi-automatic, model CF380 at the victim[.]" PSR ¶ 76. "During [this] altercation, the firearm discharged, and the bullet passed [the victim's]

head." *Id.* Williams was sentenced to 15 months' of imprisonment for this crime. In 2014, he was paroled from his state sentences of incarceration and released on supervised release from his federal sentence.

Williams also has a history of failures to follow supervised release conditions. For the 2004 aggravated assault conviction, "[m]ultiple motions to Revoke Probation were filed as the defendant committed a new offense [his other aggravated assault charges in 2010], failed to complete community service hours, failed to pay probation fees, failed to report, and failed to report a change of residence or employment." PSR ¶ 70.  Following his convictions in 2010, "Williams' term of supervised release was revoked after he submitted a urine sample positive for cocaine." PSR ¶ 76. These repeated violations demonstrate Williams' contempt for the law.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of an in-range term of incarceration. Williams' criminal history—which includes supervised release/probation violations, indicating a lack of respect for the courts and the law—false statement to the FBI, and flagrant violation of the law on January 6, 2021, all demand commensurate penalty. Accordingly, a sentence of incarceration is necessary.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[1] This Court must sentence Williams based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Williams has pleaded guilty to Counts One and Five of the Superseding Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1), and Theft of Government Property, in violation of 18 U.S.C. § 641. These offenses are Class A misdemeanors. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), apply.

---

[1] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Williams' criminal history sets him apart from many January 6 defendants; he cannot argue that his conduct that day was a momentary aberration in an otherwise law-abiding life.  While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Simon*, 21-cr-346 (BAH), the defendant pled guilty to a single count of violating 18 U.S.C. 1752(a)(2). Simon traveled from Maine to Washington D.C., where he attended the "Stop the Steal" rally before marching to the U.S. Capitol. On the Lower West Terrace, Simon briefly joined other rioters in pushing a bicycle rack into a line of officers. He then made his way to the Upper West Terrace and entered the Capitol through the Senate Wing Door at 2:14 p.m. Once inside, Simon made his way to the Crypt and to the Rotunda. At each location he yelled and chanted in the direction of the police and recorded video of the mob's engagements with the police. After the riot, he lied to the FBI. The court sentenced Simon to 8 months' incarceration, the bottom of the guideline range of 8 to 12 months. However, unlike Williams, who

is in criminal history category IV, Simon was in criminal history category I. Moreover, unlike Williams, Simon did not steal police equipment. Accordingly, a higher sentence is appropriate for Williams.

In *United States v. Alford*, 21-cr-263 (TSC), the defendant was convicted of four misdemeanors following a jury trial. Alford posted on Facebook in the days and weeks leading up to January 6, expressing his belief that the 2020 presidential election was rigged, including a meme, "By Bullet or Ballot[,] Restoration Of the Republic Is Coming." Alford entered through the Upper House Door, which had been broken open by earlier rioters. Police in riot gear were nearby and an alarm blared throughout Alford's time in the Capitol. While MPD officers attempted to remove rioters from the building, Alford continued on. Alford engaged in no violence in the Capitol and was inside for approximately 14 minutes. The court sentenced to Alford to 12 months' incarceration. While Williams, unlike Alford, pled guilty in his case, Alford, unlike Williams, did not have a criminal record.

In *United States v. Cramer*, 22-cr-339 (RDM), the defendant pled guilty to violating 18 U.S.C. § 1752(a)(2). Cramer brought a facemask and baseball bat to the Capitol. He grabbed an officer's baton and another officer's arm in the Lower West Terrace. Cramer was in the wave of rioters to breach the Senate Wing Door a second time at approximately 2:45 p.m. He took a police baton home with him as a trophy and did not tell the truth during questioning with law enforcement. The court sentenced Cramer to 8 months' incarceration. Unlike Williams, Cramer was calculated in criminal history category I.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.    **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Williams to a midpoint 15 months of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Nathaniel K. Whitesel*
Nathaniel K. Whitesel
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759

*/s/ James D. Peterson*
James D. Peterson
Special Assistant United States Attorney
Bar No. VA 35373
United States Department of Justice
1331 F Street N.W. 6th Floor
Washington, D.C. 20530
Desk: (202) 353-0796
Mobile: (202) 230-0693
James.d.peterson@usdoj.gov